517 A.2d 358

**Cheryl Marie HERBERT**

v.

**Forrest L. WHITTLE, et al.**

**No. 566, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Nov. 12, 1986.

Certiorari Denied March 23, 1987.

Edward C. Mackie, James P. O'Meara and Rollins, Smalkin, Richards & Mackie, Baltimore, for appellant.

James M. Gabler, Phillips P. O'Shaughnessy, Paul W. Spence, Sandbower, Gabler & O'Shaughnessy, P.A., Baltimore, and J. Michael Lawlor, Towson, for appellees.

Before WILNER, GARRITY and ROSALYN B. BELL, JJ.

ROSALYN B. BELL, Judge.

Cheryl Marie Herbert, appellant, appeals from a jury verdict in the Circuit Court for Baltimore County awarding $100,000 to Rebecca Lynn Whittle and $112,984 to Forrest L. Whittle, appellees. Ms. Herbert raises the following issues on appeal:

> "1. Under Maryland law, with certain exceptions not relevant here, does the entrustee of a motor vehicle have a cause of action against the entrustor for negligent entrustment?
>
> "2. Was there evidence of negligent entrustment in this case?" [1]

On May 31, 1980, Rebecca Whittle and Cheryl Herbert were seriously injured when the 1971 Mustang in which they were riding collided with a pickup truck driven by Mark Diehl.

At the time of the accident, Ms. Whittle had completed eleventh grade and was sixteen years eight months old. She was driving the standard transmission Mustang, although she possessed neither a learner's permit nor a

---

1. Ms. Herbert also alleges that the verdict was based on inconsistent instructions and that the trial court should have granted a mistrial because of the misconduct of appellees' counsel. In light of our holding on the first two issues, we need not consider these challenges.

driver's license. Ms. Herbert was nineteen years of age at the time and was only casually acquainted with Ms. Whittle.

On the date of the accident, Ms. Herbert and Ms. Whittle were among several other spectators at a band rehearsal in a church hall located in northern Baltimore County. The two women did not plan to meet at the practice. Ms. Herbert attended because her husband set up equipment for the band. Shortly after Ms. Herbert arrived at approximately 6:30 p.m., there was a discussion between Ms. Herbert and Ms. Whittle and both women decided to leave the hall and drive to a location to purchase cigarettes. Ms. Herbert asked her husband, the owner of the Mustang, for the keys, and she and Ms. Whittle departed.

Ms. Whittle and Ms. Herbert disagree about precisely what happened next. According to Ms. Whittle, as the two were walking out to the car, she asked Ms. Herbert if she could drive the Mustang. Ms. Herbert agreed and allowed Ms. Whittle to drive from the church parking lot. According to Ms. Herbert, it was not until after she drove out of the parking lot that Ms. Whittle asked if she could drive the automobile. The two women switched positions and Ms. Whittle continued driving.

There was no discussion about Ms. Whittle's driving experience or whether she had a permit to drive prior to Ms. Whittle's taking over operation of the Mustang. In reality, two days prior to the accident Ms. Whittle had completed a driver education course with a grade of B. She also was familiar with the Maryland driver's handbook. As for practical driving experience, on four to five occasions Ms. Whittle had driven her mother's automobile to the end of their one-half mile driveway and back to pick up mail, and had driven her father's tractor around the yard. In addition, she had driven motor vehicles on approximately 50–70 occasions, including on public highways, although she stated she had never before operated a standard transmission vehicle.

Ms. Whittle drove the Mustang for several miles without incident or difficulty. She acknowledged she was very

familiar with the area. The exact events that transpired in the intersection at Bee Tree Road and York Road are sketchy [2] and in dispute. Ms. Whittle asserted that she stopped at the stop sign at the top of the hill on Bee Tree Road and did not observe any cross traffic. She then pulled out into the intersection. She recalls the car stalled in the intersection and was hit by the oncoming Diehl vehicle. She alleged Diehl was traveling at an excessive rate of speed.

Ms. Herbert remembered nothing about the accident. Diehl remembered that the Mustang was, in fact, moving when the two vehicles collided and he stated that he never saw the Mustang in front of him until he hit it.

Two eyewitnesses, aged fifteen and eleven at the time of the accident, both stated that the Mustang stopped at the stop sign at the intersection and stalled. It then rolled back approximately ten feet and stopped. The driver started the automobile again and proceeded through the intersection without stopping at the traffic sign. The Mustang was halfway through the intersection where Diehl's vehicle struck it.

Ms. Whittle was hospitalized for a lengthy period of time as a result of the accident. She has recovered substantially, although there remains some permanent injury. The record does not reveal the extent of Ms. Herbert's injuries except that she sustained a "severe concussion," and was under the care of a neurologist or neurosurgeon for a year after the accident.

Forrest Whittle brought suit individually and as parent and guardian of Ms. Whittle against Ms. Herbert, her

---

**2.** Both Ms. Herbert and Ms. Whittle recalled very few facts surrounding the accident. To enhance their memories, both women underwent hypnosis. Ms. Whittle remembered several more crucial facts after hypnosis. At the opening of the trial a Motion *In Limine* was granted excluding any testimony of Ms. Whittle induced by the hypnosis. *See State v. Collins*, 296 Md. 670, 702, 464 A.2d 1028 (1983). The record extract does not disclose whether or not the same limitation was applied to the testimony of Ms. Herbert.

husband as owner of the Mustang, Mark Diehl, and his father as owner of the truck. The action against the Herberts was based on the allegation that Ms. Herbert was the agent of Mr. Herbert and that she negligently entrusted the Mustang to Ms. Whittle with knowledge that Ms. Whittle was an unlicensed and inexperienced driver. The action against the Diehls alleged negligence on the part of Mark Diehl, an agency relationship between Diehl and his father, and negligent entrustment on the part of his father.[3] The Diehls filed a cross-claim against the Herberts.

Before the matter came on for trial, Ms. Whittle reached the age of majority and was directed to file suit on her own behalf. That suit was consolidated for trial with Mr. Whittle's suit. Prior to trial, summary judgment was entered in favor of Mr. Herbert. Summary judgment based on limitations was also entered in favor of Diehl's father with respect to the claim of negligent entrustment against him. During the trial, judgment was also entered in favor of Diehl's father as to the agency count.

The jury awarded verdicts against Ms. Herbert and exonerated Mark Diehl. Ms. Herbert submitted a Motion for Judgment Notwithstanding the Verdict or in the Alternative for a New Trial. The court took the matter under advisement and over a year later denied the motion. Ms. Herbert appealed to this Court. We dismissed that appeal for lack of a final judgment on the Diehls' cross-claim and on Mr. Whittle's suit filed on behalf of Ms. Whittle as her parent and guardian. The record was perfected and Ms. Herbert again appealed.

---

**3.** The claim of negligent entrustment against Diehl's father was based on the allegation that the father knew that the minor son was involved in two prior accidents; knew his son operated motor vehicles at an excessive rate of speed and had received at least one prior speeding ticket conviction; knew his son was charged and convicted on one prior occasion of running a red traffic signal; knew of other moving violations; and knew his son had never successfully completed a driver education course.

## I. RIGHT OF ENTRUSTEE TO RECOVER AGAINST ENTRUSTOR

### The Tort of Negligent Entrustment

In *Rounds v. Phillips*, 166 Md. 151, 166–67, 170 A. 532 (1934), the Court of Appeals recognized the tort of negligent entrustment in Maryland. This tort, as embodied in the Restatement (Second) of Torts § 390 (1965), has been applied in cases subsequent to *Rounds*. *See Kahlenberg v. Goldstein*, 290 Md. 477, 431 A.2d 76 (1981); *Morrell v. Williams*, 279 Md. 497, 366 A.2d 1040 (1976); *Curley v. General Valet Serv.*, 270 Md. 248, 311 A.2d 231 (1973); *Snowhite v. State, ex rel. Tennant*, 243 Md. 291, 221 A.2d 342 (1966); *U-Haul Co. v. Rutherford*, 10 Md.App. 373, 270 A.2d 490 (1970).

Section 390 provides:

"One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them."

 The cause of action for negligent entrustment is based on the requisite knowledge of the supplier of the chattel. If the supplier knows or should know of the entrustee's propensities to use the chattel in an improper or dangerous manner, the entrustor owes a duty to foreseeable parties to withhold the chattel from the entrustee. "[T]he principal features of the tort lie in the knowledge of the supplier concerning the dangerous propensities of the entrustee and in the foreseeability of harm." *Kahlenberg*, 290 Md. at 488, 431 A.2d 76.

 In the context of supplying an automobile to an incompetent driver, the Court of Appeals in *Morrell*, 279 Md. at 503–04, 366 A.2d 1040, stated:

"[T]he doctrine requires scienter and has been applied in cases involving automobiles where the owner knew or should have known that the use of the entrusted car by the entrustee would likely involve unreasonable risk.

\* \* \* \* \* \*

[T]he doctrine of negligent entrustment may be invoked only against the vehicle owner who knows or should have known that the use would involve an inordinate risk of physical harm."

Under the tort, the entrustee's conduct in causing the injury is not imputed to the entrustor. *See Kahlenberg,* 290 Md. at 490, 431 A.2d 76; *Rounds,* 166 Md. at 160, 165–66, 170 A. 532. Instead, the entrustor's negligence consists of supplying the chattel. *Kahlenberg,* 290 Md. at 489, 431 A.2d 76. Thus, if the entrustor neither knew nor ought to have known of the inordinate risk of harm, then, even if an injury occurs, those injured are unable to recover on a theory of negligent entrustment.

### Entrustee as Plaintiff

Maryland Courts have never before decided whether a cause of action for negligent entrustment will lie between an entrustee and an entrustor. The cases in Maryland which have discussed the tort involved claims by a third party against the entrustor and the entrustee or the entrustor alone, rather than claims by the entrustee against the entrustor.

Ms. Herbert asserts that Ms. Whittle, as entrustee, is barred as a matter of law from bringing a cause of action for negligent entrustment against her entrustor. She posits that the action for negligent entrustment in the case *sub judice* required two acts of negligence—that of Ms. Herbert in supplying the chattel and that of Ms. Whittle in actually causing the injury. Ms. Herbert argues that under Comment c to the Restatement,[4] only an entrustee who is " 'of a

---

4. This Comment states in part:

class which is legally recognized as so incompetent as to prevent them from being responsible for their actions,' " or an entrustee who is in a " 'condition ... such as to make [her] incapable of exercising the care which it is reasonable to expect of a normal sober adult' " may recover against the entrustor. (Brackets in original.) Since, she continues, Ms. Whittle does not meet either criterion, there can be no cause of action by her because her negligence amounted to contributory negligence which, by operation of law, bars her recovery.

Ms. Herbert relies on *Curley v. General Valet Service,* 270 Md. 248, 311 A.2d 231 (1973), and *Kahlenberg,* 290 Md. at 488, 431 A.2d 76, to support her position. In *Curley,* the Court of Appeals did recognize "that the entrustor is only responsible for the subsequent *negligent acts of the entrustee* if a reasonable man could have foreseen the *negligent acts....*" 270 Md. at 267, 311 A.2d 231 (emphasis added). Similarly, in *Kahlenberg,* the Court again asserted that the liability of the entrustor is based "upon the negligent entrustment when it operates as a concurrent cause with the *negligence of the entrustee.*" 290 Md. at 488, 431 A.2d 76 (emphasis added). The language in these two cases suggests that the entrustee, of legal necessity, must be negligent for the cause of action of negligent entrustment to arise. Whether the exceptions stated in Comment c to the Restatement or any other exception will be applied in Maryland will have to be decided in another case on another day. We do not need to reach this issue because the

---

"If ... the person to whom the chattel is supplied is one of a class which is legally recognized as so incompetent as to prevent them from being responsible for their actions, the supplier may be liable for harm suffered by him, as when a loaded gun is entrusted to a child of tender years. So too, if the supplier knows that the condition of the person to whom the chattel is supplied is such as to make him incapable of exercising the care which it is reasonable to expect of a normal sober adult, the supplier may be liable for harm sustained by the incompetent...."

Restatement (Second) of Torts § 390 Comment c (1965).

entrustee failed to establish the requisite knowledge of the entrustor.[5] We turn then to the evidence in this case.

## II. EVIDENCE OF NEGLIGENT ENTRUSTMENT

██ As we stated, proof of the entrustor's knowledge is an essential element of this cause of action. The entrustor may be charged not only with what he or she actually knew, but with what he or she should have known. *Morrell,* 279 Md. at 503, 366 A.2d 1040. Additionally, if the circumstances suggested that further inquiry was appropriate and, despite such circumstances, the entrustor failed to make a reasonable investigation, the entrustor may be liable. *Tri-State Truck & Equip. Co. v. Stauffer,* 24 Md.App. 221, 241, 330 A.2d 680, *cert. denied,* 275 Md. 757 (1975). Finally, an entrustment not negligent in its origin may become so if allowed to persist after the entrustor has learned or has had reason to learn that the entrustee was not qualified to use the chattel. *General Valet Serv. v. Curley,* 16 Md.App. 453, 298 A.2d 190, *rev'd on other grounds,* 270 Md. 248, 311 A.2d 231 (1973).

Comment b to the Restatement rule states in pertinent part:

"[O]ne who supplies a chattel for the use of another who knows its exact character and condition is not entitled to assume that the other will use it safely if the supplier knows or has reason to know that such other is likely to use it dangerously, as where the other belongs to a class which is notoriously incompetent to use the chattel safely, or *lacks the training and experience necessary for such use,* or the supplier knows that the other has on other occasions so acted that the supplier should realize that the chattel is likely to be dangerously used, or that the other, though otherwise capable of using the chattel

---

5. Moreover, appellees fall short of claiming that any of the exceptions provided in Comment c apply to the case *sub judice.*

safely, has a propensity of fixed purpose to misuse it." (Emphasis added.)

Restatement (Second) of Torts § 390 Comment b (1965).

Ms. Whittle alleges only that she lacked training and experience. Hence, evidence relevant to the question of negligent entrustment must show that Ms. Herbert knew, or from facts known to her should have known, that Ms. Whittle was likely to use the Mustang in a manner involving an unreasonable risk of bodily harm.

To be successful, Ms. Whittle must establish that the accident occurred due to her inexperience and incompetence in operating a standard transmission. If the stalling occurred because of momentary mechanical malfunction unknown to Ms. Herbert, then even if we were to hold that Ms. Herbert entrusted the vehicle with the requisite knowledge about Ms. Whittle, the entrustment of the vehicle would not be the legal cause of the harm sustained. The mechanical malfunction would amount to an efficient, intervening cause breaking the chain of causation. *See Segerman v. Jones*, 256 Md. 109, 127–28, 259 A.2d 794 (1969), quoting *Holler v. Lowery*, 175 Md. 149, 161, 200 A. 353 (1938).[6]

In addition, we note at the outset that the mere fact that Ms. Whittle did not possess either a learner's permit or a driver's license at the time of the accident is important only as it relates to her inexperience with a standard transmission automobile. Since Ms. Whittle admitted that she knew how to drive an automobile, the gravamen of the tort in this case is Ms. Herbert's knowledge, either subjective or objective, that Ms. Whittle could not operate this particular type of vehicle.

---

**6.** In their response to Ms. Herbert's Motion for Judgment Notwithstanding the Verdict or in the Alternative for a New Trial, appellees contended that the reason for the stalling was never determined and propounded that "[i]t is just as likely that the car stalled by reason of malfunction as from operator error."

Ms. Herbert moved for a Judgment Notwithstanding the Verdict or in the Alternative for a New Trial asserting that there was a dearth of legally sufficient evidence from which the jury could have concluded that she supplied the automobile to Ms. Whittle knowing affirmatively, or at least suspecting, that Ms. Whittle was inexperienced and incompetent in operating a standard transmission. Appellees, naturally, suggested otherwise and the court agreed.

In determining the propriety of this assertion, we are mindful of the posture with which this Court must consider the evidence. We are required to view the evidence and all inferences therefrom in a light most favorable to Ms. Whittle; "[w]e must resolve all conflicts in the evidence in [Ms. Whittle's] favor and assume the truth of all the evidence and such inferences as may be naturally and reasonably deducible therefrom, in the light most favorable to [Ms. Whittle]." *Menish v. Polinger Co.*, 277 Md. 553, 567, 356 A.2d 233 (1976). Where all of a party's evidence taken together does not rise above speculation, hypothesis and conjecture, it is error for a trial judge to deny a motion for judgment notwithstanding the verdict. *Montgomery Ward & Co. v. McFarland*, 21 Md.App. 501, 513–14, 515–16, 319 A.2d 824 (1974).

Although it is time consuming to do so, we must examine all the relevant evidence presented since the issue is whether the evidence was sufficient to support the verdicts. The following pertinent evidence relative to Ms. Herbert's knowledge was adduced at trial.

Ms. Whittle's testimony was sparse at best. On direct examination, she stated that on the evening in question, she was picked up by a young man to go to the band rehearsal. She averred that she "met" Ms. Herbert at the practice that night, although she did not remember if Ms. Herbert were there when she arrived. Ms. Whittle described the individuals in attendance at the practice as "teenagers" ranging in age from 17 to 23. She testified that after she asked Ms. Herbert if she could drive, Ms. Herbert stated: "If you

think you are ready, I will let you drive." Since this statement was hypnotically induced,[7] it was struck from the evidence and the court issued a cautionary instruction to the jury to ignore this evidence.

On cross-examination, Ms. Whittle related that she met Ms. Herbert one to two years prior to the accident through Mr. Herbert and his cousin, Susan. She related that she saw Ms. Herbert "a few times a week," since they lived in the same general area, even though Ms. Herbert would not be in her company. When questioned whether her relationship was closer or more frequent with Mr. Herbert rather than with Ms. Herbert, she responded: "Well, I had known him longer.... [H]e was very good friends with my brother." She also recounted that when the Whittle family members saw Mr. Herbert's mother or father, they would exchange greetings.

A portion of Ms. Whittle's deposition was also admitted into evidence in defendant Diehl's case. This portion was read to the jury by Diehl's counsel as follows:

"Question: Do you recall any discussions with [Ms. Herbert] before the accident, talking about not the date of the accident, but prior to that, about you attending driver's ed. or your desire to become a licensed driver?

"Answer: Nothing more than the fact she knew I was in driver's ed., knew I was taking it.

"Question: How do you recall that she knew that from conversation?

"Answer: Casual talk.

"Question: Something that you had mentioned to her?

"Answer: Uh-huh."

Ms. Herbert's counsel then requested and received permission to read to the jury the next few lines in the sequence:

"[Question:] That was the extent of any discussions prior to the day of the accident with respect to your driving or operating automobiles?

---

7. See note 2.

"[Answer:] Yes, it was."

Mr. Whittle took the stand and stated in pertinent part that he had never met Ms. Herbert prior to the accident, although he may have known who she was. He acknowledged that Ms. Herbert had never been to the Whittle home and surmised that Ms. Whittle had never been in Ms. Herbert's home.

In her defense, Ms. Herbert testified that she moved to the area in 1978 and had no contact with Ms. Whittle or her family during that year. She also corroborated Mr. Whittle's account that she had never been to the Whittle house, and asserted that she had never had any contact with the Whittle family, except Ms. Whittle, prior to the accident. She denied that her husband and his family were friendly with the Whittles. In describing her relationship with Ms. Whittle, Ms. Herbert noted that when she lived with Susan's family for a period of two months in 1979, she "came to know" Ms. Whittle when Ms. Whittle visited Susan on three or four occasions. Ms. Herbert affirmatively stated that other than band practice, she had no social contact with Ms. Whittle and for the couple of months she had been attending rehearsal, the two were both in attendance on only five or six occasions. Her testimony also revealed that she had no plans to meet Ms. Whittle at band practice on the evening in question and did not know at what time Ms. Whittle arrived. With respect to Ms. Whittle's driving experience, Ms. Herbert averred, contrary to Ms. Whittle's deposition, that they had never discussed whether Ms. Whittle was taking a driver education course.

On cross-examination, her testimony disclosed that on the few occasions when Ms. Whittle visited Susan, she did not know how Ms. Whittle arrived or departed or how long she would stay. When asked if she spoke to Ms. Whittle during those visits, Ms. Herbert responded: "I would say hello to her." She continued that the three women did not converse "a lot" because she was usually visiting across the street at her then future husband's home. She also testified that

when she and Ms. Whittle would speak, they would converse about "basic casual things. Hello. How are you. Different things like that.... I wasn't very close with her and the people she hung around with." She emphasized that she did not attend the same high school as Ms. Whittle attended and never went to that high school to visit anyone, including Ms. Whittle. The following colloquy on cross-examination summarizes Ms. Herbert's assessment of her own knowledge about Ms. Whittle's age:

"Q Did you know what grade Becky was in in 1979, January of 1979, when you first met her?

"A No.

"Q Did you know she was going to high school?

"A Yes.

"Q And you never asked her what grade she was in?

"A No.

 \* \* \* \* \* \*

"Q But you knew she was in the high school, Hereford High School?

"A Yes, I knew some of the people that she went to school with.

"Q What grades were they in?

"A In the eleventh.

"Q In the eleventh grade. Then you knew that Becky was in the eleventh grade. But when you met her in 1979, she was only in the tenth grade, wasn't she?

"A That I do not know.

"Q Is it your testimony to the ladies and gentlemen of the jury that you have no idea as to how old Becky was when you first met her?

"A No.

"Q That you never gained any idea as to how old she was during the year and a half that you knew her?

"A No.

"Q Is that your testimony?

"A Yes, it is."

Ms. Herbert admitted that she had never before observed Ms. Whittle driving an automobile and never inquired into Ms. Whittle's driving experience or license status before entrusting the Mustang to her. She explained that she turned the car over to Ms. Whittle because she "assumed" Ms. Whittle was licensed to drive since most of the individuals at the practice were licensed drivers.

On redirect examination, Ms. Herbert stressed that when Ms. Whittle came over to Susan's home, she never came specifically to visit Ms. Herbert and that there would be no prearrangement to meet both Ms. Herbert and Susan.

The other crucial evidence before the jury, to which we are not privy, is Ms. Whittle's physical appearance at trial, i.e., how immature or mature she looked. Although Ms. Herbert obviously could view Ms. Whittle's appearance on the occasions they saw each other, the record does not disclose how Ms. Whittle appeared on the night of the accident.

### Actual Knowledge

■ Appellees contend this evidence was sufficient to establish that Ms. Herbert knew Ms. Whittle was inexperienced and incompetent in driving a standard transmission vehicle. Drawing the inferences appellees argue we must, the most that can be gleaned from the evidence is that Ms. Herbert knew Ms. Whittle was in high school; she knew she socialized with eleventh graders at school; she knew at one point Ms. Whittle was learning how to drive; and she knew she was among individuals in attendance at band practice ranging in age from 17 to 23, a minority of whom were unlicensed. This evidence of knowledge simply was not enough to rise above mere speculation that Ms. Herbert possessed the requisite knowledge so as to submit the question to the jury. *Montgomery Ward & Co.*, 21 Md. App. at 513–14, 515–16, 319 A.2d 824.

### Attributable Knowledge

■ Appellees also assert that even if the evidence were not sufficient to establish that Ms. Herbert knew of Ms.

Whittle's inexperience and incompetence, the evidence was sufficient to establish that Ms. Herbert should have known of Ms. Whittle's incapabilities. Appellees point to several circumstances to support their contention: the fact that Ms. Whittle arrived at Susan's home without a car; the fact that she arrived at band practice without a car; the atmosphere of band rehearsal; the lack of discussion of whose car to take to get cigarettes; and the fact that the car rolled back ten feet at the intersection before stopping.

There is nothing in the record to suggest, much less establish, that Ms. Herbert was aware of Ms. Whittle's usual travel arrangements. The two women never agreed to meet either at Susan's house or at band rehearsal, so whether Ms. Whittle was driven to various places or whether she drove herself was of no concern to Ms. Herbert. Even if Ms. Herbert knew that Ms. Whittle was driven to Susan's home and band practice, this fact alone would not be sufficient to support the inference that Ms. Herbert ought to have known Ms. Whittle could not drive a standard transmission car. It is just as likely that Ms. Whittle was driven to these places because there was not an automobile available for her personal use or because, in the case of band practice, she was picked up for a date.

Appellees do not specify how the casual atmosphere of the band rehearsal would have alerted a reasonable person to Ms. Whittle's lack of experience. With respect to the lack of discussion of whose car to take, no party introduced any evidence about the substance of the women's discussion prior to leaving the parking lot. In any event, the only logical inference is that Ms. Herbert knew Ms. Whittle did not have a car available to her on this particular occasion.

Ms. Whittle also points to the circumstances of "the ten feet of uncontrolled drifting backwards just prior to entering the critical intersection" and suggests this event should have put Ms. Herbert on notice respecting Ms. Whittle's

experience or competence.[8] We cannot comprehend how appellees can seriously contend that the logical inference to be drawn from drifting backward on an incline is that Ms. Herbert should have suspected Ms. Whittle was unqualified to operate the Mustang. Even the most experienced drivers of stick-shifted vehicles occasionally drift backwards for short distances on an incline. Perhaps the fact that the car rolled backwards would alert suspicion about the driver's capabilities if it were for a greater distance or if it were coupled with other evidence of the inability to smoothly operate the car, such as the repeated jerking of the vehicle when the operation of the gas and clutch pedals are not properly synchronized. There is no such evidence in this case. In fact, eyewitnesses testified that the car was being operated in a normal fashion.[9] In summation, all these circumstances together support no more than mere conjecture and hypothesis that Ms. Herbert ought to have known of Ms. Whittle's inexperience and incompetence in driving the Mustang.

### Inquiry

Ms. Herbert contends, citing *Morrell v. Williams*, 279 Md. 497, 366 A.2d 1040 (1976), and *Bauman v. Woodfield*, 244 Md. 207, 223 A.2d 364 (1966), that she was entitled to rely on Ms. Whittle's offer to drive and the logical inference therefrom that Ms. Whittle felt she could perform the skill competently. Appellees suggest that there was no such representation "because common sense and experience dictate that a sixteen year old's request to drive a stick-shift

---

8. We point out that Ms. Whittle's own account of the accident does not allege any drifting occurred. This testimony was related by the two eyewitnesses to the accident who both stated that Ms. Whittle stalled at the stop sign, drifted back, restarted the engine and proceeded through the stop sign without stopping. Nevertheless, we must consider the evidence of drifting if it is favorable to Ms. Whittle.

9. In her deposition, Ms. Whittle stated she found driving the Mustang no different from driving an automatic transmission vehicle, and felt comfortable driving it. She stated she operated the vehicle smoothly and did not grind the gears or have any other difficulty with operating the car during the 10–15 minutes she drove it.

automobile is, in no way, a representation that she is competent to do so."

In *Morrell* and *Bauman*, the Court of Appeals ruled that employers were entitled to rely on the representations of competence made by their employees. In *Morrell*, the Court noted that after the entrustee told the entrustor "that he had a driver's license, that he had driven automobiles in Maryland before going into the army, that after entering the Army in 1968 he had undergone driver's training at Fort Dix, that he had driven army vehicles at Fort Dix, that he had driven army trucks in Vietnam for nearly a year, and that after returning to Fort Meade in Maryland, he had driven army vehicles on Maryland highways," there was insufficient evidence of negligent entrustment. 279 Md. at 504, 366 A.2d 1040 (footnote omitted).

Similarly, in *Bauman*, the Court ruled that the employer was entitled to rely on the representation of the entrustee's competence when the entrustee "advertised his services by word of mouth and held himself out as being capable of doing the work he undertook to do." 244 Md. at 217–18, 223 A.2d 364. If in *Morrell* and *Bauman* the Court held that employers who hire drivers who regularly travel on the public roadways were not required to check into the abilities of their employees, surely Ms. Herbert was entitled to rely on Ms. Whittle's implication that she could drive for this one particular occasion on lightly trafficked roads.

Ms. Herbert simply was not under a duty to inquire whether Ms. Whittle was competent and experienced to drive a standard transmission car from the facts known or available to her. Before one can be required to make any inquiry, he or she must possess knowledge of some facts or circumstances to put him or her on notice. Only a person who has knowledge of circumstances sufficient to put a prudent person on inquiry of a particular fact, in this case Ms. Whittle's inexperience or incompetence, is deemed to have notice of the fact itself where an investigation would in all probability have revealed that fact if it had been

pursued. *Williams v. Skyline Dev. Corp.*, 265 Md. 130, 164, 288 A.2d 333 (1972); *see, e.g., Rounds v. Phillips*, 168 Md. 120, 126, 177 A. 174 (1935).

There is no evidence in the record of any circumstances known to Ms. Herbert that would have put a prudent person on inquiry respecting Ms. Whittle's competence or experience as a driver. To the contrary, the fact that she knew Ms. Whittle was in high school and thus of sufficient driving age, and the fact that she knew Ms. Whittle had taken a driver education course, suggest it was appropriate to rely on Ms. Whittle's representation. Moreover, common sense suggests that Ms. Herbert obviously considered Ms. Whittle a competent driver. Absent a driving instruction situation, a prudent person ordinarily would not voluntarily ride as a passenger in a vehicle driven by a known incompetent.

In conclusion, taking the evidence and all favorable inferences therefrom, we hold as a matter of law there was not sufficient evidence to establish that Ms. Herbert knew or ought to have known or ought to have inquired into Ms. Whittle's experience and competence to drive a standard transmission vehicle.

This conclusion is even more apparent when we compare those facts and circumstances known to Ms. Herbert with those facts and circumstances known to entrustors who have been held liable for harm in Maryland. In *Rounds*, a directed verdict in favor of the entrustors was improper where the evidence established that the parents of an entrustee entrusted an automobile to their minor son with actual knowledge of the son's habit of intoxication and habitual and negligent use of automobiles. Evidence was presented that the father knew that his son had been seriously injured in a previous accident when the vehicle he was driving struck a stationary automobile wholly off the roadway; that his son had a conviction for driving a vehicle while intoxicated; and that he had a reputation as a fast and reckless driver. In addition, the record disclosed that

the father knew that the son's driving permit and registration for his car had been revoked for driving while intoxicated. *Rounds,* 168 Md. at 125–26, 177 A. 174.

In *Snowhite,* 243 Md. at 315, 221 A.2d 342, the Court of Appeals held that an employer was liable for negligent entrustment because he knew the entrustee driver frequently used the company truck for personal use; knew he had four moving violations in a two and one-half year period; knew he was involved in one automobile accident; and also knew of his habit of drinking heavily for two years prior to the automobile collision in question. In fact, the entrustor would go to a local bar to retrieve the driver, and with knowledge that he had been drinking, send the driver in a gasoline truck out on deliveries. 243 Md. 291, 297–99, 221 A.2d 342 (1966).

In *Curley,* sufficient knowledge was found on the part of an entrustor who knew of six serious moving violations on the entrustee driver's part within a five-year period prior to the accident, four of which were of the same nature as that which caused the automobile accident in that case. 270 Md. at 252–53, 311 A.2d 231. In examining the sufficiency of that evidence, the Court of Appeals stated:

"We think [the entrustee's] particular record of moving violations, known to [the entrustor] at the time it employed him, considered in light of the type of vehicle he was driving [a van] and area in which he was known to be driving it [heavily populated and trafficked urban areas] constitutes evidence which, though meager, was legally sufficient in the circumstances of this case to permit the jury to rationally find that [the entrustee's] failure to heed traffic control devices was habitual and as a consequence rendered him an incompetent driver whose use of the van entrusted to him by [the entrustor] posed an unreasonable risk of physical harm to others."

270 Md. at 266, 311 A.2d 231. We find it instructive in gauging the sufficiency of the evidence in the case *sub*

*judice* that the Court of Appeals considered the evidence of the entrustor's knowledge in *Curley* "meager."

In the instant case, there simply was no evidence of knowledge on the part of Ms. Herbert even approaching that possessed by the entrustors in *Rounds, Snowhite,* and *Curley.* We would be engaging in mere hypothesis, conjecture and speculation were we to accept Ms. Whittle's theory that because Ms. Herbert knew Ms. Whittle was in high school; knew, at one point, she was taking a driver education course; knew several of the individuals at band practice possessed driver's licenses; and based on their casual relationship and Ms. Whittle's mysterious arrivals and departures, Ms. Herbert knew or should have known that Ms. Whittle could not operate the Mustang. Taken to its logical conclusion, Ms. Whittle's theory would have serious consequences. No high school student or new gearshift operator would ever gain any driving experience for fear on the part of car owners that they would be liable should injury result.

Based on our conclusion that there was insufficient evidence to establish negligent entrustment, an entry for a judgment notwithstanding the verdict was in order. In denying Ms. Herbert's motion for such a judgment, the court stated:

> "No one is going to say that this is the strongest evidence in the world, but there are reasonable inferences to be drawn from the testimony. ... The statement by [Ms. Herbert], 'If you think you are ready, I will let you drive,' could have been relied on by the jury to infer that [Ms. Herbert] had some knowledge that [Ms. Whittle] was inexperienced. Thus, the jury could have properly determined that [Ms. Herbert] negligently entrusted the vehicle to [Ms. Whittle] under the facts they had before them and that the vehicle then was used in a manner involving unreasonable risk of physical harm."

It is clear that in ruling the evidence was sufficient, the trial court considered it a salient fact that Ms. Herbert inquired into Ms. Whittle's readiness to drive. As we

previously noted, this statement was struck from the evidence. We cannot predict whether the trial court would still have considered the evidence "strong" enough had it excluded this statement from its assessment of the sufficiency of the proof.

We recognize that it is rare for a reviewing court, despite a jury verdict to the contrary, to hold that there was insufficient evidence to raise a jury question on the issue of negligence. We also recognize that this automobile accident brought a substantial emotional, physical and monetary strain on all parties and their families. Nevertheless, when the trial process goes askew and a jury verdict is not proper, it is this Court's duty to reverse that result.

### III. RECOVERY BY PARENT OF ENTRUSTEE

■ We now reach consideration of Mr. Whittle's award for loss of services and medical expenses against Ms. Herbert.[10] When a minor is injured by the alleged negligent act of a third party, two causes of action arise: there is a right of action on behalf of the minor for the personal injuries suffered and there is a cause of action accruing to the parent for consequential damages, such as loss of services and expenses resulting from injury to the minor child. *Hudson v. Hudson*, 226 Md. 521, 528–30, 174 A.2d 339 (1961). Nevertheless, an essential element of a parent's cause of action is that the requested compensation flow from a personal injury for which, under the law, the child would be entitled to recover. *Hudson*, 226 Md. at 531, 174 A.2d 339. If the child is not entitled to recover, the parent cannot recover.

Since we have held that Ms. Herbert is not liable to Ms. Whittle because she did not possess the requisite knowledge, Mr. Whittle, as her parent, is also unable to recover.

---

**10.** We will assume without deciding that the parent of an entrustee is a foreseeable plaintiff under § 390 such that the parent is able to maintain an action against an entrustor.

JUDGMENTS REVERSED.
COSTS TO BE PAID BY APPELLEES.